**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TIMOTHY SCOTT WORKMAN, | CASE NO. 3:24-cv-1300 |
| Petitioner, | DISTRICT JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| WARDEN JOSSETTE OKEREKE, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

Petitioner Timothy Scott Workman ("Petitioner" or "Mr. Workman") brings this habeas corpus petition pursuant to 28 U.S.C. § 2254 based on his conviction for 78 counts of illegal use of a minor in nudity-oriented material and one count of tampering with evidence in Auglaize County Court of Common Pleas, Case No. 2014-cr-75.  (ECF Doc. 1 ("Petition").)  He filed his Petition *pro se* on July 11, 2024.[1]  (*Id.*)  The matter was assigned to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  On December 12, 2024, Respondent Warden Jossette Okereke ("Respondent") filed a Motion to Dismiss the Petition as untimely under the applicable statute of limitations.  (ECF Doc. 10.)  Petitioner filed a Traverse in response to the motion on January 21, 2025.  (ECF Doc. 11.)  On May 6, 2025, Petitioner filed a Motion for Bond Pending Resolution.  (ECF Doc. 14.)  Respondent filed a memorandum in opposition, and Petitioner filed a reply.  (ECF Docs. 15, 16.)  Both motions are fully briefed and ripe for disposition

---

[1] "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack*, 487 U.S. 266, 273 (1988)).  Mr. Workman's Petition was docketed on July 17, 2024 (ECF Doc. 1), but was placed in the prison mailing system on July 11, 2024 (*id.* at p. 16).

For the reasons set forth herein, the undersigned recommends that the Court: **DENY** Petitioner's Motion for Bond; **GRANT** Respondent's Motion to Dismiss Grounds Two, Five, Six, Seven, and Eight of the Petition as untimely under the statute of limitations and **DISMISS** Grounds Two, Five, Six, Seven, and Eight with prejudice; and **DENY without prejudice** Respondent's Motion to Dismiss Grounds One, Three, Four, Nine, Ten, and Eleven.

## I.  Factual and Procedural Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  *See id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

On direct appeal, the Ohio Third District Court of Appeals succinctly summarized the basic facts underlying Mr. Workman's conviction and sentence as follows:

> {¶ 2} This case stems from an investigation of Workman for taking nude photos of juvenile girls and intending to conduct another photo and a video shoot in 2013. Workman was arrested after two juvenile girls reported to law enforcement officers that Workman took nude photos of them in March and July 2013 at the Knights Inn in Wapakoneta, Ohio, and Workman arranged with law enforcement officers posing as one of the juvenile girls to conduct another photo and video shoot on September 30, 2013 at the Americas Best Value Inn & Suites. [. . .] Workman was arrested on September 30, 2013 after he rented a room at the Americas Best Value Inn & Suites in St. Marys, Ohio. (*Id.* at 185–186).

*State v. Workman*, 2015-Ohio-5049, ¶ 2 (Ohio App. Ct. 2015); (ECF Doc. 10-1, p. 295.)

Following denial of Mr. Workman's direct appeal, he proceeded to file multiple motions for a new trial, multiple motions for reconsideration, and multiple, successive petitions for post-conviction relief over the next nine years.  (*See* ECF Docs. 10-1, 10-2, 10-3, 10-4.)  In 2023, he was declared a vexatious litigator in state court.  *See Pierce v. Workman*, 2023-Ohio-2022, 2023 WL 4074791 (Ohio Ct. App. 2023), *appeal not allowed* 171 Ohio St. 3d 1455 (2023).  The

undersigned has reviewed Respondent's Motion, as well as the state court record, and finds that Respondent accurately summarized the procedural history in this case.[2]  (ECF Doc. 10, pp. 2-33.)  In the interests of judicial economy, the undersigned incorporates by reference Respondent's 32-page summary of the procedural history.

## II.  Motion for Bond

Petitioner filed a Motion for Bond Pending Resolution of his habeas proceedings on May 6, 2025.  (ECF Doc. 14.)  Respondent opposed the Motion (ECF Doc. 15), and Petitioner filed a reply (ECF Doc. 16).

While a federal court has the authority to grant the relief sought, the "[r]elease of a state prisoner pending consideration of the habeas corpus petition is reserved for the extraordinary case." *Greenup v. Snyder*, 57 F. App'x 620, 621 (6th Cir. 2003)  Indeed, because a habeas petition challenges a presumptively valid state court conviction, the Sixth Circuit has recognized that "both principles of comity and common-sense dictate that it will indeed be the very unusual case where a habeas petitioner is admitted to bail prior to a decision on the merits in the habeas case." *Id.* (quoting *Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993)); *see Pouncy v. Palmer*, 993 F.3d 461, 463 (6th Cir. 2021) (noting that "[i]t will be the rare occasion" when an inmate is able to satisfy the standard for bond in the habeas context).

In *Dotson v. Clark,* the Sixth Circuit set forth the standard for bond motions in habeas proceedings:

> In order to receive bail pending a decision on the merits, prisoners must be able to show not only a substantial claim of law based on the facts surrounding the petition but also

---

[2] The undersigned notes two incorrect dates in Respondent's summary that appear to be typographical errors. Respondent states that the trial court denied Petitioner's first petition for post-conviction relief on February 10, 2016, rather than the correct date of February 11, 2016.  (ECF Doc. 10, p. 7; ECF Doc. 10-1, p. 464.)  Respondent also states that on June 20, 2018, the Ohio Supreme Court declined to accept jurisdiction of Petitioner's appeal of the denial of his fifth untimely motion for a new trial.  (ECF Doc. 10, p. 14.)  The record indicates the Ohio Supreme Court filed this decision on December 12, 2018.  (ECF Doc. 10-2, p. 396.)  The correct dates are evidenced in the record and are not material to the undersigned's analysis.

the existence of "some circumstance making [the motion for bail] exceptional and deserving of special treatment in the interests of justice." There will be few occasions where a prisoner will meet this standard.

900 F.2d 77, 79 (6th Cir. 1990) (quoting *Aronson v. May,* 85 S.Ct. 3, 5 (1964) (Douglas, J., in chambers)).

Under this two-prong standard, even if Mr. Workman could demonstrate that his habeas claim was substantial, he would still have to show some exceptional circumstance "deserving of special treatment." *See Heflin v. Black*, No. 1:22-CV-00863-CEF, 2023 WL 5353133, at *2 (N.D. Ohio June 22, 2023) (denying a habeas petitioner's motion for bond solely on the exceptional circumstances prong), *report and recommendation adopted,* 2023 WL 5352047 (N.D. Ohio Aug. 21, 2023); *Walker v. Marquis*, No. 1:18CV0806, 2019 WL 358700, at *2 (N.D. Ohio Jan. 28, 2019) (same).

Here, Petitioner has not shown that exceptional circumstances exist that justify granting bond. His sole argument in support of his Motion is that "his case falls into the category of being exceptional" because he can prove he is innocent. (ECF Doc. 14, pp. 1-2; *see* ECF Doc. 16, p. 2.) He then proceeds to repeat arguments made in his Petition and Traverse. (Compare ECF Docs. 14, 16 with ECF Docs. 1-1, 1-2, 1-3, 1-4, 10.) For the reasons discussed in Section III.C.3.ii, *infra*, the undersigned finds that Mr. Workman has not shown he is innocent.

As Petitioner has not shown special circumstances justify granting bond in this case, the undersigned recommends that his Motion for Bond be **DENIED**.

### III.    Federal Habeas Corpus Petition

Mr. Workman raises 11 grounds for relief in his Petition:

**Ground One:** Actual Innocence.

**Ground Two:** Ineffective assistance of counsel.

**Ground Three:** *Brady* violations.

**Ground Four:** Witness tampering.

**Ground 5:** Prosecutorial Misconduct.

**Ground 6:** Violation of the 14th U.S. Constitutional Amendment.

**Ground 7:** Unlawful search and seizure.

**Ground 8:** The court unlawfully changed the record.

**Ground 9:** Trial court lacked subject matter jurisdiction.

**Ground 10:** Abuse of Discretion.

**Ground 11:** Chain of custody violation.

(ECF Doc. 1-1, p. 2.)

Respondent contends that Mr. Workman's Petition is untimely because it was not filed within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," *see* 28 U.S.C. § 2244(d)(1)(A), and Petitioner cannot show he is entitled to a delayed start date for calculating the statute of limitations. (ECF Doc. 10, pp. 34-36.)  Respondent further asserts that neither statutory nor equitable tolling excuse the untimely filing.  (*Id*. at pp. 36-42.)  In response, Mr. Workman argues that he exercised due diligence in finding and submitting new evidence that both entitles him to a later start date for calculating the statute of limitations and shows his actual innocence. (ECF Doc. 11, pp. 4, 10-15, 19-22, 24-31; *see also,* ECF Doc. 1, p. 14.)

A.    **Standard of Review Under AEDPA**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA.  *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  "As

amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Id.* (citing 28 U.S.C. §§ 2254(a), (b), (c)). If an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *See Cullen*, 563 U.S. at 181.

**B.      AEDPA Statute of Limitations**

28 U.S.C. § 2244 limits the time within which a person in custody pursuant to the judgment of a state court may file a petition for a federal writ of habeas corpus, providing in relevant part:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation shall run from the latest of --
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

6

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d).  AEDPA's statutory tolling provision provides:

The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).  Thus, under section 2244(d)(2), the statute of limitations is tolled for as long as a properly filed application for post-conviction relief or other collateral review is pending in the state courts.  *See Jurado v. Burt*, 337 F.3d 638, 640 (6th Cir. 2003).  This statutory tolling continues "until the application has achieved final resolution through the State's post-conviction procedures," *Carey v. Saffold*, 536 U.S. 214, 220 (2002), and further "until the expiration of the period for further State court review, whether or not the petitioner actually seeks such review," *Holbrook v. Curtin*, 833 F.3d 612, 615 (6th Cir. 2016) (internal quotations omitted).

Section 2244(d)(2) does not toll the limitations period during the filing of a subsequent petition for certiorari to the United States Supreme Court because such a petition is federal and therefore "not a part of a 'State's post-conviction procedures.'" *Lawrence v. Fla.*, 549 U.S. 327, 337 (2007) (quoting 28 U.S.C. § 2244(d)(2)).  In addition, the tolling provision does not "revive the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (internal quotations and citation omitted).  Thus, once the limitations period has expired, a "collateral petition[] can no longer serve to avoid a statute of limitations." *Id.*

7

In addition to statutory tolling, the AEDPA statute of limitations may be equitably tolled in appropriate circumstances.  The Supreme Court has explained that the statute of limitations defense "is not jurisdictional" and "does not set forth an inflexible rule requiring dismissal whenever its clock has run." *Holland v. Fla.*, 560 U.S. 631, 649 (2010) (internal quotations omitted).  Equitable tolling allows federal courts to excuse the statute of limitations bar where tolling is appropriate to "relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules." *Id.* at 650 (internal quotations omitted).  There are generally two forms of equitable tolling available in this context, traditional equitable tolling and tolling based on "actual innocence."

To support traditional equitable tolling, a petitioner must show that: (1) "he has been pursuing his rights diligently"; and (2) "some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 649 (internal citations and quotations omitted); *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2011).  Tolling is evaluated on a case-by-case basis and must be "applied sparingly," with the petitioner retaining the "ultimate burden of persuading the court that he or she is entitled to equitable tolling."  *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011) (internal quotations and citations omitted).  "[P]ro se status and lack of knowledge of the law are not sufficient to constitute an extraordinary circumstance and to excuse . . . late filing." *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012); *see also Hall*, 662 F.3d at 750-52 (lack of transcript, pro se status and limited law library access did not warrant equitable tolling); *Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002) (finding "lack of legal training, [a petitioner's] poor education, or even [a petitioner's] illiteracy" are not reasons to toll the statute of limitations).

The Supreme Court has also found that equitable tolling may apply where a petitioner "can credibly demonstrate actual innocence." *Hubbard v. Rewerts*, 98 F.4th 736, 742 (6th Cir. 2024), cert. denied sub nom. *Hubbard v. Tanner*, 145 S. Ct. 1201 (2025) (citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)); *see also Patterson v. Lafler*, 455 F. App'x 606, 609 (6th Cir. 2012) (explaining that a petitioner "may also be eligible for equitable tolling if he demonstrates actual innocence, so that by refusing to consider his petition due to timeliness the court would cause a fundamental miscarriage of justice") (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)). Equitable tolling under this standard "requires the presentation of 'new reliable evidence'" not presented at trial, which may include "'exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Hubbard*, 98 F.4th at 743 (quoting *Schlup v. Delo,* 513 U.S. 298, 324 (1995)).

Although a petitioner must present "new reliable evidence" to meet this standard, courts are directed to look to the entire record to determine whether a credible claim of actual innocence has been made. *Id.* (citing *House v. Bell*, 547 U.S. 518, 537 (2006)). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)) (internal quotation marks omitted). Thus, to be entitled to equitable tolling, a petitioner must do "more than only undermine the state's case." *Hubbard*, 98 F.4th at 748. Ultimately, the Supreme Court has underscored that "the miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at 394-95 (brackets in original) (quoting *Schlup*, 513 U.S. at 329).

**C.** **Some Claims in the Petition Should be Dismissed as Untimely**

Respondent moves to dismiss the Petition as untimely because: (1) it was not filed within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" under 28 U.S.C. § 2244(d)(1)(A); (2) newly filed evidence does not warrant a later start date for the statute of limitations under 28 U.S.C. § 2244(d)(1)(D) because the "factual predicates" for the claims in the Petition could have been discovered years ago; and (3) neither statutory nor equitable tolling can render the Petition timely.  (ECF Doc. 10, pp. 34-42.)  In response, Mr. Workman argues that he exercised due diligence in finding and submitting new evidence that both entitles him to a later start date for calculating the statute of limitations and shows his actual innocence.  (ECF Doc. 11, pp. 4, 10-15, 19-22, 24-31; *see also,* ECF Doc. 1, p. 14.)  Each argument is addressed in turn below.

**1.** **Mr. Workman's Petition is Untimely Under § 2244(d)(1)(A)**

The Supreme Court of Ohio declined to accept jurisdiction of Mr. Workman's direct appeal on April 20, 2016.  (ECF Doc. 10-1, p. 407.)  Applying § 2244(d)(1)(A) to the facts of this case, Mr. Workman's conviction became final when the time to file his petition for certiorari with the United States Supreme Court expired ninety days later, on July 19, 2016.  *See* 28 U.S.C. § 2244(d)(1)(A) ("The limitation period shall run from . . . the date on which the judgment became final by the conclusion of *direct* review or the expiration of the time for seeking such review.") (emphasis added).  Thus, the AEDPA statute of limitations started to run on July 20, 2016, and expired on July 19, 2017.  Mr. Workman did not file his Petition until seven years later, on July 11, 2024.  (ECF Doc. 1.)  Since the Petition was filed after the statute of limitations expired, the Petition is time-barred under § 2244(d)(1)(A) unless the statute of limitations was tolled.

### 2.      Statutory Tolling Does Not Render the Petition Timely

Under § 2244(d)(2), AEDPA's statute of limitations is tolled for as long as a properly filed application for post-conviction relief or other collateral review is pending in the state courts.  *See Jurado*, 337 F.3d at 640.  Mr. Workman filed nine petitions for post-conviction relief (ECF Doc. 10-1, pp. 423-59, 738-56; ECF Doc. 10-2, pp. 397-447, 580-601, 747-93; ECF Doc. 10-3, pp. 26-76, 318-40, 427-503, 720-66), nine motions for a new trial (ECF Doc. 10-1, pp. 614-46, 703-24; ECF Doc. 10-2, pp. 42-86, 243-50, 255-85; ECF Doc. 10-3, pp. 170-84; ECF Doc 10-4, pp. 25-60, 178-93, 322-40), an application to reopen his direct appeal (ECF Doc. 10-1, pp. 599-611), three motions for a *Franks* hearing (ECF Doc. 10-1, pp. 555-66; ECF Doc. 10-4, pp. 426-49, 492-533), and various other motions, including a motion challenging jurisdiction and a motion to correct the record (*see, e.g.*, ECF Doc. 10-3, pp. 280-90, 641-46).  Only one of these post-conviction petitions operated to toll the statute of limitations under § 2244(d)(2).

The first post-conviction petition was filed on September 16, 2015, while Petitioner's direct appeal was pending at the Third District Court of Appeals.  (ECF Doc. 10-1, pp. 294 (showing the Third District ruled on Petitioner's direct appeal on December 8, 2015); 423 (showing the post-conviction petition was filed on September 16, 2015).)  The trial court denied the petition for post-conviction relief on February 11, 2016 (*id.* at pp. 464-65), and the Third District affirmed that decision, on July 25, 2016 (*id.* at pp. 511-20).

Because Petitioner's first post-conviction proceedings ran parallel to his direct appeal for a time, his post-conviction proceedings are not considered pending for the purposes of statutory tolling until the end of the period to seek certiorari on direct review with the Supreme Court on July 19, 2016.  Thus, the statutory period began to toll on July 20, 2016, and continued until the period for seeking review of the post-conviction petition expired.  The Third District denied

Petitioner's post-conviction petition on July 25, 2016, meaning Petitioner had 45 days to timely appeal that decision to the Ohio Supreme Court.  *See* Ohio S. Ct. Prac. R. 7.01(a)(1)(A)(i).  He did not do so.  Since no time elapsed between the start of the statute of limitations on July 20, 2016, and the start of the tolling period on July 20, 2016, the statute of limitations was tolled until the end of the period for filing a timely appeal to the Ohio Supreme Court on September 8, 2016.  Thus, the one-year clock was tolled until September 9, 2016.  With statutory tolling, Petitioner's habeas petition was therefore due on or before September 9, 2017.

Petitioner filed several more requests for collateral relief while the statute of limitations was tolled or running, between July 20, 2016 and September 9, 2017.  He filed a motion for a delayed appeal and untimely notice of appeal of the denial of his petition for post-conviction relief with the Supreme Court of Ohio in January 2017, which was denied in March 2017.  (ECF Doc. 10-1, pp. 522, 535, 554.)  He also filed motions for a new trial in August and December 2016, and a successive petition for post-conviction relief in April 2017.  (*Id*. at pp. 614, 703, 738.)  The court found the motions for a new trial untimely in October 2016 and February 2017; Petitioner did not file an appeal.  (*Id*. at pp. 699-702, 736-37.)  The court dismissed the petition for post-conviction relief as untimely in April 2017, finding Petitioner had not shown any good reason to extend the filing deadline; the court of appeals affirmed.  (*Id*. at pp. 757, 823-25).

Although the above requests for collateral relief were filed before the expiration of the statute of limitations, they could not further extend the statutory tolling period because the state courts found each of the requests to be untimely.  When a post-conviction petition has been found untimely under state law, the Supreme Court explains that it was not "properly filed" under § 2244(d)(2).  *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005); *Allen v. Siebert*, 552 U.S. 3, 5 (2007).  Accordingly, none of the additional requests for post-conviction relief

Petitioner filed between July 20, 2016 and September 9, 2017 were "properly filed" under § 2244(d)(2), and therefore could not operate to further toll AEDPA's statute of limitations.

Similarly, none of the subsequent requests for post-conviction or collateral relief that were filed after the expiration of the limitations period on September 9, 2017, could operate to toll the statute of limitations.  AEDPA's statutory tolling provision does not "revive the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run." *Vroman*, 346 F.3d at 602 (internal quotations and citation omitted).  Because a "collateral petition[] can no longer serve to avoid a statute of limitations" once the limitations period has expired, *id.*, the filing of successive requests for state post-conviction relief after the statute of limitations expired under § 2244(d)(1)(A) could not toll the statute of limitations.

For the reasons set forth above, the undersigned concludes that Mr. Workman's first petition for post-conviction relief tolled the statute of limitations for 50 days under § 2244(d)(2), but that none of his subsequent state post-conviction filings operated to further toll the statute of limitations.  His tolled limitations period expired on September 9, 2017, and he did not file his Petition until July 2024, over six years later.  Finding no basis for statutory tolling that would make the current Petition timely, the undersigned turns to equitable tolling.

### 3.    Equitable Tolling Does Not Apply

Equitable tolling of the statute of limitations is available where a petitioner can show that "he has been pursuing his rights diligently" and "some extraordinary circumstance stood in his way and prevented timely filing," *Holland*, 560 U.S. at 649, or where he can demonstrate actual innocence though the introduction of new reliable evidence that was not presented at trial, *Hubbard*, 98 F.4th at 742 (citing *McQuiggin*, 569 U.S. at 386 and *Schlup*, 513 U.S. at 324).  Mr. Workman has failed to show he is entitled to equitable tolling under either standard.

### i.     Traditional Equitable Tolling

Respondent argues that Mr. Workman is not entitled to traditional equitable tolling because he: (1) has not shown diligence in pursuing his rights, filing untimely motions in state court for seven years before seeking federal habeas relief; and (2) "has asserted no reasonable circumstances outside of his control" to explain why he did not assert his present claims in a timely-filed petition for federal habeas relief.  (ECF Doc. 10, p. 40.)

As to the first showing required for traditional tolling—that Petitioner diligently pursued his rights—Mr. Workman argues he diligently pursued his rights by uncovering new evidence and filing motions with the state courts "until and through 2023."  (ECF Doc. 1, p. 14; ECF Doc. 11, p. 31.)  But the Sixth Circuit addressed a similar argument—that a petitioner demonstrated diligence by pursuing *state* post-conviction proceedings—in *Vroman v. Brigano*, observing that the petitioner still "fail[ed] to address his lack of diligence in timely filing a petition for habeas relief" and concluding that the petitioner's decision to proceed solely in the state courts "rather than filing his federal habeas petition and protecting his federal constitutional rights, demonstrates a lack of diligence."  *Vroman*, 346 F.3d at 605.  Here too, Mr. Workman has failed to demonstrate that he diligently pursued his *federal habeas* rights, regardless of how many post-conviction requests for relief he filed in the state courts.[3]  Mr. Workman has thus failed to demonstrate the diligence necessary to support traditional equitable tolling.

Because Petitioner has not shown that he diligently pursued his federal habeas rights, this Court need not address whether the second requirement for traditional tolling—that "some

---

[3] The undersigned further observes that Mr. Workman's state-court filings were not only rejected as untimely but were also found at times to be cumulative and/or duplicative.  (*See, e.g.*, ECF Doc. 10-2, pp. 858-60 (noting that "the remainder of the claims and arguments presented in Workman's [fifth] successive petition replicate those presented in previous petitions for post-conviction relief."); ECF Doc. 10-4, p. 538 (finding that Petitioner's third motion for a *Franks* hearing was frivolous and "merely a request for reconsideration of an earlier judgment").)

extraordinary circumstance stood in his way and prevented timely filing"—has been met.  The undersigned nevertheless observes that most of the documents Mr. Workman has attached to his Petition as evidence that was allegedly not available to him at trial were in his possession and filed with the state courts in or before 2021.  Mr. Workman has offered no argument as to why he delayed until 2024 before seeking federal habeas relief based on those documents, and the undersigned accordingly finds he has failed to demonstrate that those documents represent an "extraordinary circumstance" that prevented the timely filing of his Petition.

Specifically, the documents he possessed in or before 2021 include: a daily log from Rockford Police Department sent to Petitioner on March 6, 2018 (ECF Doc. 1-6, pp. 10-21); a police incident report written by Sgt. Mathew Pack of Auglaize County Sheriff's Department, dated September 30, 2013 (*id*. at p. 1); part of a police report written by Detective Doug Timmerman of Mercer County Sheriff's Department, dated September 30, 2013 (ECF Doc. 1-5, p. 22); an affidavit of a Skylar Leugers dated January 3, 2020 (*id*. at pp. 37-38); two affidavits of an Aaron Chapman dated January and December 2020 (*id*. at pp. 39-42); forensic reports from PC Solutions and Viper Systems dated January 25, 2017 (*id*. at pp. 29-30); and two affidavits of forensic expert Mark Lucas dated November 3, 2017 and June 11, 2021 (*id*. at pp. 24-25, 31-32).

Mr. Workman submitted each of those documents to the state courts in or before 2021. (*See* ECF Doc. 10-1, pp. 614-41 (attaching portion of Detective Timmerman report to a 2016 motion for a new trial), 738-56 (requesting post-conviction relief in April 2017 based on 2017 Lucas affidavit, Sgt. Pack report, and PC Solutions and Viper Systems reports); ECF Doc. 10-2, pp. 747-93 (moving to set aside conviction and vacate judgment in 2019 based on daily log from Rockford Police Department); ECF Doc. 10-3, pp. 427-97 (seeking post-conviction relief in March 2020 based on Leugers affidavit and January 2020 Chapman affidavit), 720-66 (seeking

post-conviction relief in January 2021 based on December 2020 Chapman affidavit); ECF Doc. 10-4, pp. 178-93 (moving for a new trial in July 2021 and submitting 2021 Lucas affidavit).) Given the years-long delay between Mr. Workman having this evidence and bringing his federal petition, none of the evidence shows an "extraordinary circumstance" preventing timely filing.

The most recent evidence filed with the Petition is a set of three affidavits from Mr. Workman's former employee Jeff Collingsworth, the first of which was reportedly sent to Mr. Workman by the Mercer County Public Defender on September 7, 2023.  (ECF Doc. 1-5, pp. 2-18.)[4]  Among other statements, Mr. Collingsworth averred that: (1) his friend and Auglaize County police officer Justin Chisolm told him after Petitioner's arrest on September 30, 2013, that Petitioner had been arrested for having sex with a 13-year-old girl (ECF Doc. 10-4, p. 567); (2) Officer Chisolm asked Mr. Collingsworth to help him keep Mr. Workman in jail by transferring pictures from two white cell phones (a galaxy and an iPhone) onto a black iPhone (*id*. at pp. 569, 573); (3) Mr. Collingsworth had the pictures transferred as Officer Chisolm requested and wrote down the numbers of the three phones, identifying them as SGHi317, BCGE2422B, and BCGE2380A (*id*. at p. 577);[5] and (4) Officer Chisholm warned Mr. Collingsworth not to speak to Petitioner or Petitioner's attorney (*id*. at p. 567).  Mr. Collingsworth also averred that he talked with Mr. Workman's ex-girlfriend Amanda and the two girls who testified against him at trial, and that Amanda told the girls she would pay them to say it was Mr. Workman who took pictures of them so that he would "never g[e]t out of jail,"

---

[4] Petitioner submitted a copy of the first Collingsworth affidavit that is missing pages 4-6.  (ECF Doc. 1-5, pp. 2-11.) Thus, where necessary, the undersigned cites to the copy submitted to the state court, which is complete but was filed with some pages out of order.  (ECF Doc. 10-4, pp. 564-77.)

[5] Petitioner asserts that the fact Mr. Collingsworth wrote down these numbers proves Mr. Collingsworth had possession of these phones at some point.  (ECF Doc. 1-1, p. 28.)  The fact that these numbers are included in the Collingsworth affidavits does not bolster their reliability.  The numbers were available in the trial transcript, to which Petitioner has access, as demonstrated by his many citations to it.  (*See generally*, ECF Docs. 1-1, 11.)

and they agreed.  (*Id.* at p. 570.)  Mr. Collingsworth purportedly shared this information with

Officer Chisholm, who told him not to tell Mr. Workman's attorney or anyone else.  (*Id.*)

Although the affidavits allude to conversations between Mr. Collingsworth and Mr. Workman

when they were both in prison together (ECF Doc. 1-5, pp. 7-8), Mr. Workman asserts that he

did not know about "the secret illegal activities of someone manufacturing evidence to use

against him at trial" until he received the affidavits in 2023 (ECF Doc. 11, pp. 21, 31).

Mr. Workman requested leave to file a motion for new trial with the state trial court in

October 2023, attaching the Collingsworth affidavits as "[n]ewly [d]iscovered evidence."  (ECF

Doc. 10-4, p. 559-77.)  The trial court denied the application, concluding that Mr. Workman

would have known or been able to ascertain the information in the affidavit with due diligence

since Mr. Collingsworth was his employee and friend.  (*Id.* at pp. 579-80.)  The court also noted

that Mr. Workman had a history of factual distortion, that the affidavit was filed with an

untimely application for a new trial in Mr. Collingsworth's own 2022 case, and that the second

affidavit was unsigned and had an illegible notary signature.  (*Id.*)

In reviewing the Collingsworth affidavits, the undersigned also has significant concerns

about their reliability.  First, as the state court noted, the documents have some procedural

deficiencies.  For example, Mr. Collingsworth's signature, the date, and the notary signature are

not legible on the first two affidavits (ECF Doc. 10-4, pp. 576-77; ECF Doc. 1-5, pp. 11-12), and

the third "affidavit," while it contains signatures and a seal, was prepared well after the others, is

written in question-and-answer format, contains some new information, and appears to repeat

other information from the first two verbatim (ECF Doc. 1-5, pp. 13-19).

Second, the affidavits were reportedly written by a person who is both a former employee

and, more recently, a fellow inmate of Mr. Workman.  It is generally recognized that statements

from fellow inmates are "suspect." *Hubbard*, 98 F.4th at 749; *see Jordan v. Rapelje*, No. 11-14358, 2013 WL 766190, at *9 (E.D. Mich. Feb. 28, 2013) (finding affidavits from people incarcerated with a petitioner are generally "viewed with suspicion"; collecting cases).  The same may be said of statements from individuals who are "closely aligned with" a petitioner.  *See generally Lewis v. Smith,* 100 F. App'x 351, 355 (6th Cir. 2004) (highlighting a prior observation in dicta of "our suspicion of exculpatory affidavits submitted by someone closely aligned with a defendant"); *House*, 547 U.S. at 552 (finding a statement from an eyewitness with no motive to lie has "more probative value than, for example testimony from inmates, suspects, or friends or relations of the accused").

Third, Mr. Collingsworth reportedly waited ten years to disclose his participation in fabricating evidence and his knowledge that witnesses were paid to falsely implicate Mr. Workman at trial.  An unexplained, lengthy delay in coming forward with new evidence is relevant in assessing the reliability of that evidence.  *McQuiggin*, 569 U.S. at 399; *see Hubbard*, 98 F.4t at 749-50 (finding affidavit "patently unreliable" when it came from a fellow inmate almost twenty years after the crime in question with little explanation for the delay and no corroborating evidence); *see also Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J. concurring) (noting that affidavits produced "at the 11th hour" to show a petitioner's innocence deserve "a fair degree of skepticism").

Here, Mr. Collingsworth's explanation for his ten year delay in disclosing both his fabrication of evidence and his knowledge of perjured testimony appears to be as follows: (1) Officer Chisholm originally told him Mr. Workman was charged with having sex with a 13-year-old girl; (2) Mr. Collingsworth fabricated evidence for Officer Chisholm so Mr. Workman would not be released from jail; (3) Mr. Collingsworth also told Officer Chisholm that Mr. Workman's

18

ex-girlfriend had paid witnesses to lie, and Officer Chisholm told him not to tell anyone; (4) nine years later, another officer told Mr. Collingsworth he would help him with his pending criminal charges if he kept quiet; (5) ultimately, the officers did not help Mr. Collingsworth, and he got a longer sentence than he was promised; (6) after he was sent to prison, Mr. Collingsworth met with Mr. Workman and learned that Mr. Workman was sent to prison for taking nude pictures of teenaged girls, not for child molestation; (7) if Mr. Collingsworth had received the shorter sentence he was promised, he would have kept his mouth shut like the officers told him to; but (8) because he did not get the promised sentence, he disclosed that Officer Chisholm told him to move pictures to the black phone, that he told Officer Chisholm about the ex-girlfriend paying witnesses to lie, and that he did not talk to Mr. Workman's attorney or go to his trial because Officer Chisholm told him not to.  (ECF Doc. 10-4, pp. 567-76.)

Both Mr. Collingsworth's testimony and his explanation for the ten-year delay in making the relevant disclosures are unreliable.  He says he willingly participated in fabricating evidence and kept quiet about witnesses being paid to give false testimony back in 2013 and would have continued to do so even today if the police had only lived up to their agreement—which they reportedly entered nine years later—to help Mr. Collingsworth get a lower sentence on his new, unrelated criminal charges.  In other words, he admits to lying, fabricating, and concealing information material to a criminal conviction, and that he was willing to continue to do so when he stood to personally benefit.  He also admits to talking to Mr. Workman about his conviction after being sent to prison and before preparing the relevant affidavits.  He attached the first affidavit to an untimely motion to withdraw his own guilty plea, even though the content of the affidavit focused almost exclusively on purported revelations and evidence pertinent to Mr. Workman's conviction, not to Mr. Collingsworth's.  For example, the affidavits contain no

19

information about when or why Mr. Collingsworth was convicted, do not lay out facts to establish how he was coerced into pleading guilty, and do not explain why he included so many details about an unrelated, ten-year-old criminal case involving a different defendant when moving to withdraw his own guilty plea.

In the context of Mr. Collingsworth's background as Mr. Workman's former employee, his later status as a fellow inmate who admittedly met with Mr. Workman in prison before preparing the relevant affidavits, and the delay of more than a decade between the events Mr. Collingsworth now describes and his disclosure of those allegations, the undersigned finds Mr. Collingsworth's three affidavits from 2023 are insufficiently reliable to be treated as an "extraordinary circumstance" that prevented the timely filing of Mr. Workman's Petition.

For the reasons set forth above, the undersigned concludes that Mr. Workman has not met his burden to demonstrate that (1) "he has been pursuing his rights diligently" and (2) "some extraordinary circumstance stood in his way and prevented timely filing."  *See Holland*, 560 U.S. at 649.  Thus, traditional equitable tolling is not appropriate in this case.

### ii.     Fundamental Miscarriage of Justice

A petitioner may be entitled to equitable tolling if he "can credibly demonstrate actual innocence."  *Hubbard*, 98 F.4th at 742 (citing *McQuiggin*, 569 U.S. at 386).  To do so, he must present "new reliable evidence" that was not presented at trial, such as "'exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'"  *Hubbard*, 98 F.4th at 743 (quoting *Schlup*, 513 U.S. at 324).  And even if new reliable evidence is presented, this Court must still consider the entire record in assessing whether a credible claim of actual innocence has been made because "actual innocence means factual innocence, not mere legal insufficiency."  *Id.* (citing *House*, 547 U.S. at 537 and *Bousley*, 523 U.S. at 623).  Ultimately,

equitable tolling may only be awarded under this exception in cases where "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at 395 (brackets in original) (quoting *Schlup*, 513 U.S. at 329).

In his Traverse, Mr. Workman asserts actual innocence as a reason to excuse his late-filed Petition based on equitable tolling.[6]  (ECF Doc. 11, pp. 29-31.)  In support, he contends that the following documents are "newly discovered evidence" proving his innocence (*see* ECF Doc. 1-1, pp. 18-50; ECF Doc. 11, pp. 7-15, 19-21, 24-31): the Rockford Police Department daily log; Sgt. Pack's incident report from September 30, 2013; Detective Timmerman's report from September 30, 2013; the Leugers affidavit; the Chapman affidavits; reports from PC Solutions and Viper Systems; forensic expert Mark Lucas's two affidavits; and the Collingsworth affidavits.

Petitioner primarily asserts that his "new" evidence supports one or more of four main arguments for his actual innocence.  First, he argues that the police manufactured evidence against him by having Mr. Collingsworth put incriminating photographs on the black iPhone, State's Exhibit 91C, which was used as evidence at trial.  (ECF Doc. 1-1, pp. 18, 22; ECF Doc. 11, p. 31.)  Second, he argues that he did not own or did not possess either of the phones containing incriminating pictures that were presented at trial (the black iPhone and a Samsung Galaxy Note 2, State's Exhibit 85C).  (ECF Doc. 1-1, pp. 40-43, 47-48; ECF Doc. 11, pp. 11-15, 25-26.)  Third, he argues that the victims originally reported a Scott Sheeley to the police as the one who photographed them nude, and that they later lied and changed their story to name Mr. Workman.  (ECF Doc. 1-1, pp. 21, 23, 43-47; ECF Doc. 11, pp. 28-29.)  Finally, he argues that

---

[6] Mr. Workman also raises "Actual Innocence" as a separate ground for relief.  (ECF Doc. 1, p. 6; ECF Doc. 1-1, p. 18.)  To the extent he seeks to assert a federal habeas claim for "actual innocence," the Sixth Circuit observes that "the Supreme Court has not decided whether actual innocence is a substantive ground for relief" and that actual innocence is typically used instead as "a 'gateway' by which a petitioner may belatedly file other constitutional and federally cognizable claims."  *Hubbard*, 98 F.4th at 742-43 (citing *McQuiggin*, 569 U.S. at 393).

he can show the man in State's Exhibit 104-3 (a photograph of one of the victims showing a man reflected in a mirror) is not him.  (ECF Doc. 1-1, pp. 31-37; ECF Doc. 11, pp. 7-10.)[7]

This Court's consideration of equitable tolling under the actual innocence standard must begin with consideration of whether the evidence is both "new" and "reliable," and progress to whether that new evidence shows, when considered in the context of the entire record, that "'it is more likely than not that no reasonable juror would have convicted" Mr. Workman.  *McQuiggin*, 569 U.S. at 395 (quoting *Schlup*, 513 U.S. at 329).  Since evidence is considered "'new' for the purposes of the actual-innocence inquiry so long as it was not presented at trial," *Hubbard*, 98 F.4d at 743 (internal quotations and citations omitted), the undersigned will focus on (1) whether the evidence is reliable and (2) whether the new evidence makes it more likely than not that no reasonable juror would have convicted Petitioner.  For the reasons set forth below, the undersigned concludes that many of the documents lack reliability, and that the entirety of the evidence, viewed in the context of the whole record, is insufficient to demonstrate that Mr. Workman is factually innocent for purposes of equitable tolling of the statute of limitations.

Before turning to Mr. Workman's four primary theories of innocence, the undersigned will address a single piece of evidence that does not clearly fit into any of those theories. Petitioner has submitted an incident report from Sgt. Mathew Pack which indicates Mr. Workman was placed in administrative segregation at Auglaize County Jail after his arrest on September 30, 2013.  (ECF Doc. 1-6, p. 1.)  Petitioner asserts that the report contradicts the trial testimony of Roy Hatfield, who testified that he and Petitioner shared a jail cell after Petitioner's

---

[7] Petitioner also asserts that Mr. Collingsworth "confessed" to "the crimes of possession" of the black iPhone, State's Exhibit 91C.  (ECF Doc. 1-1, pp. 18, 21.)  To the extent Petitioner is arguing he cannot be guilty of possessing material showing a minor in a state of nudity because Mr. Collingsworth "confessed" to that crime, the argument is not well-taken.  As discussed in Section III.C.3.i., *supra*, and below, the Collingsworth affidavits are of questionable reliability, and they do not overcome substantial other evidence submitted against Petitioner at trial.

22

arrest, and that Petitioner made incriminating admissions to him at that time. (ECF Doc. 11, pp. 28; *see* ECF Doc. 13-1, pp. 520-21 (Tr. 513:11-514:5), 545 (Tr. 537:12-19).) This incident report does not demonstrate factual innocence. At most, it impeaches Mr. Hatfield's testimony. Such impeachment evidence, which "is a step removed from evidence pertaining to the crime itself," is insufficient to establish a miscarriage of justice under the actual innocence standard. *Calderon v. Thompson*, 523 U.S. 538, 563 (1998); *see Mason v. Chapman*, No. 4:23-CV-12359, 2024 WL 3825235, at *6 (E.D. Mich. Aug. 13, 2024), certificate of appealability denied sub nom. *Mason v. Tanner*, 2025 WL 865249 (6th Cir. Mar. 5, 2025) (finding impeachment evidence insufficient to demonstrate actual innocence for purposes of a free-standing innocence claim, to excuse procedural default, or to toll the limitations period). The undersigned now turns to the remaining "new" evidence and related innocence arguments.

### a. "Police Planted Evidence" Argument

Mr. Workman argues that the Collingsworth affidavits show he is not guilty of the crimes of which he was convicted because Mr. Collingsworth helped the police manufacture evidence against him. (ECF Doc. 1-1, p. 18; ECF Doc. 11, pp. 24-31.) Mr. Collingsworth avers that his friend, police officer Justin Chisolm, told him after Petitioner's arrest in 2013 that Petitioner had been arrested for having sex with a 13-year-old girl. (ECF Doc. 10-4, p. 567.) Officer Chisolm then allegedly asked Mr. Collingsworth to help him keep Mr. Workman in jail by transferring pictures from two white cell phones onto a black iPhone. (*Id*. at pp. 569, 573.) Mr. Collingsworth claims he did so and wrote down the numbers of the three phones, identifying them as SGHi317, BCGE2422B, and BCGE2380A. (*Id*. at p. 577.) He also asserts that Officer Chisolm warned him not to speak to Petitioner or Petitioner's attorney. (*Id*. at p. 567.)

23

As discussed in Section III.C.3.i., *supra*, the undersigned finds the Collingsworth affidavits to be unreliable. The affiant is a fellow inmate and former employee of Mr. Workman, who offers purported exonerating testimony in circumstances that are highly questionable. The undersigned finds Mr. Collingsworth's stated reasons for fabricating evidence and keeping quiet about witnesses who agreed to testify falsely, his reasons for waiting ten years to disclose this information, and his reasons for making the disclosures in the largely irrelevant context of his own criminal proceedings to be both suspect and improbable. The Collingsworth affidavits therefore do not constitute new "reliable" evidence for the purpose of this tolling analysis.

But even if the affidavits were considered "reliable," they are still inadequate to establish, in the context of the entire evidentiary record, that Mr. Workman is factually innocent of the crimes of which he was convicted. Mr. Workman argues that the Collingsworth affidavits prove his innocence because they demonstrate that photographs of nude minors which were on a black iPhone presented as evidence at trial were put on the phone *after* his arrest, thus "eliminating" all of the State's physical evidence. (ECF Doc. 1-1, pp. 27-28.) But the entire record reflects that the State also submitted a white Samsung phone and related SD cards found in Petitioner's work truck into evidence, which also contained nude photographs of the victims, in addition to texts between Petitioner and a victim setting up photo shoots. (ECF Doc. 13-1, pp. 338-47 (Tr. 330:6-336:6, 338:1-339:5), 429-30 (Tr. 421:2-422:14), 607-17 (Tr. 599:22-609:7), 631-32 (Tr.623:1-624:5).) Thus, the black iPhone and its contents were not all of the State's physical evidence.

Moreover, Sgt. Terry Sneary, the State's expert on the forensic analysis of cell phones testified that the nude photos existed on the black iPhone as of March 14, 2013, months before Petitioner's arrest. (*Id*. at pp. 651-56 (Tr. 643:1-648:2).) Given this contradictory testimony, the Collingsworth affidavits would serve at most as evidence to impeach the testimony of the state's

forensic witness, rather than as evidence establishing Petitioner's factual innocence.  *See Calderon*, 523 U.S. at 563; *Mason*, 2024 WL 3825235, at *6.

Accordingly, the undersigned concludes that the Collingsworth affidavits are not new reliable evidence sufficient to show "it is more likely than not that no reasonable juror would have convicted" Mr. Workman under his theory that the police manufactured evidence by adding incriminating photographs to a phone that was used as evidence at trial.

### b.       "Wrong Phone" Argument

Mr. Workman also argues that his innocence is demonstrated by the fact that the phones used as evidence against him at trial (a white Samsung and a black iPhone) were not his phones, while his phone (an AT&T LG flip phone) did not contain incriminating evidence.  (ECF Doc. 1-1, pp. 40-42; ECF Doc. 11, pp. 11-15, 25-26.)  In support of this argument, he submits the Collingsworth affidavits, the December 2020 Chapman affidavit, and one page from a police report written by Detective. Timmerman.  (ECF Doc. 11, p. 26; *see* ECF Doc. 1-1, pp. 40-42.)

The Collingsworth affidavits are unreliable for the reasons set forth in Sections III.C.3.i. and III.C.3.ii.a., *supra*.  Both the January 2020 and the December 2020 Chapman affidavits are unreliable for similar reasons.  Mr. Chapman avers that he was both a member of Mr. Workman's gym and an employee at Workman's Plumbing, and that he prepared his affidavits in 2020 after he and Mr. Workman met in prison and talked about Mr. Workman's case.  (ECF Doc. 1-5, pp. 39, 42.)  In the December 2020 affidavit, he talks about details relating to Mr. Workman's 2013 arrest, asserting that he would have testified to those details at trial if called by Mr. Workman's attorney.  (*Id.* at pp. 42-43.)  As discussed above, statements by fellow inmates and people who are closely aligned with a defendant are generally suspect.  *See, e.g., Hubbard*, 98 F.4th at 749; *Jordan*, 2013 WL 766190, at *9; *Lewis*, 100 F. App'x at 355; *House*, 547 U.S. at

25

552.  And affidavits purporting to exonerate a defendant after a lengthy delay in disclosure are also suspect and unreliable, particularly when there is little explanation for the delay and no corroborating evidence.  *See Hubbard*, 98 F.4th at 749-50; *see also McQuiggin*, 569 U.S. at 399; *Herrera*, 506 U.S. at 423.  The Chapman and Collingsworth affidavits therefore do not constitute new "reliable" evidence for the purpose of this equitable tolling analysis.

But even if the affidavits were "reliable," they are still inadequate to establish—in the context of the entire evidentiary record, including Detective Timmerman's report—that Mr. Workman is factually innocent.  Petitioner contends that the Chapman affidavit shows he could not have possessed the Samsung phone seized from his Chevy work truck because he was not driving the truck on the night he was arrested, and his truck was impounded.  (ECF Doc. 11, pp. 25-26.)  Mr. Chapman states that he and another employee named "Trina" drove one of Mr. Workman's work trucks, a 1996 Chevy Spartan Utility truck, to Duffy's restaurant to meet Mr. Workman and some contractors on the day of Petitioner's arrest.  (ECF Doc. 1-5, p. 42.)  He further states Mr. Workman arrived in his Dodge work van after Mr. Chapman arrived, and that he later saw Mr. Workman being arrested while standing by the 1996 Chevy, which the police later towed.  (*Id.*)

However, police officers who participated in Petitioner's arrest testified that they watched him arrive at the Best Value Inn and Hotel in St. Mary's, a location where text messages between Mr. Workman and one of the victims indicate they planned hold another photo shoot, driving a van with "Workman" written on it.  (ECF Doc. 13-1, p. 440 (Tr. 432:6-17).)  They did not mention the specific year and model, but testified that they watched Petitioner exit this vehicle, then arrested him on the spot next to it.  (*Id*. at p. 441 (Tr. 433:5-11).)  The vehicle was then impounded and later identified as the 2003 white Chevy work van depicted at State's Exhibit

101-1 and registered in Petitioner's name.  (*Id*. at pp. 752 (Tr. 744:9-21), 774 (Tr. 766:15-20));

*see also* ECF Doc. 1-5, p. 1 (copy of State's Exhibit 101-1).)  Thus, even accepted as true, Mr.

Chapman's affidavit only serves to impeach police testimony about the circumstances

surrounding Petitioner's arrest and which of his work vans was impounded by the police.

Petitioner contends that the Timmerman report shows the police had possession of one of

the victim's phones, proving that "Detective Pat Green lied under oath when he testified that he

found [the victim's] black iPhone during the fourth search of . . .  1996 Chevy Spartan Utility

Truck on October 18, 2013."  (*Id*. at p. 26; *see* ECF Doc. 1-1, p. 41.)  First of all, no 1996 Chevy

was mentioned at trial.  Presumably, Petitioner is attempting to show that the police had

possession of the victim's phone and were thus able to plant pictures on it, connecting the dots to

the Collingsworth affidavits, in which Mr. Collingsworth claims he moved photographs from a

white Samsung phone (which Petitioner asserts belonged to Trina) to a black iPhone (which

Petitioner asserts belonged to one of the victims).  (ECF Doc. 1-1, p. 27; ECF Doc. 1-5, p. 12.)

Petitioner's arguments rest on the proposition that the black iPhone found in his work

van, State's Exhibit 91C, belonged to one of the victims and not to him.  He repeatedly cites this

as an established fact.  (*See, e.g.,* ECF Doc. 11, p. 11 ("the only phone that matters in this case is

[the victim's] black iPhone 3 . . . state's exhibits 91C).)  In reviewing the trial transcript, the

undersigned found no indication that one of the victims' phones was presented as evidence of

Mr. Workman's guilt.  His attorney attempted to suggest that State's Exhibit 91C belonged to

one of the victims based on a police officer's error in labeling evidence.  (ECF Doc. 13-1, pp.

670-73 (Tr. 661:6-665:5).)  However, the error was sufficiently explained (*id*. at pp. 686-87 (Tr.

678:22-679:21)), and there is no other evidence suggesting that State's Exhibit 91C, the black

iPhone, belonged to one of the victims as Petitioner claims.  Thus, evidence indicating that Detective Timmerman had possession of the phone for a time is not material.

Most importantly, Petitioner admitted at trial that he had a black iPhone, that the black iPhone labeled Exhibit 91C was "probably" his, that the Samsung Galaxy Note II labeled Exhibit 85C was his, and that the phone case labeled Exhibit 85E was the case in which he kept his Samsung.  (*Id*. at pp. 956-57 (Tr. 948:13-949:18).)  Thus, any argument that he did not own or possess the incriminating phones is not well-taken, nor is any evidence purporting to show they belonged to others.  At most, any such evidence would serve to impeach trial evidence— including Mr. Workman's own testimony—suggesting that the phones belonged to Mr. Workman, rather than as evidence establishing Petitioner's factual innocence.  *See Calderon*, 523 U.S. at 563; *Mason*, 2024 WL 3825235, at *6.

Accordingly, the undersigned concludes that the Collingsworth affidavits, the Chapman affidavit, and the Timmerman report are not new reliable evidence sufficient to show "it is more likely than not that no reasonable juror would have convicted" Mr. Workman under his theory that he did not own or possess the phones that contained incriminating evidence.

### c.     "Wrong Scott" Argument

Mr. Workman, who goes by Scott, also argues that his factual innocence is established by evidence showing the victims originally accused a Scott Sheeley of photographing them nude, but later changed their story based on some animus against Petitioner.  (ECF Doc. 1-1, pp. 28-30; ECF Doc. 11, pp. 28-29.)  To support this contention, he submits the Collingsworth affidavits, the Leugers affidavit, the January 2020 Chapman affidavit, and a Rockford Police Report.

A review of the documents making up the Rockford Police Report raises significant concerns regarding the reliability of that evidence.  The first page is a cover letter from the Chief

of Rockford Police, signed, addressed to Petitioner, and bearing the department's letterhead, contact information, and a printed picture. (ECF Doc. 1-6, p. 9.) The second page appears to be an officer's daily log and contains a "COPY" stamp suggesting it was copied and sent to Petitioner. (*Id*. at p. 10.) These two pages of the document appear sufficiently authentic.

However, the complete document submitted by Petitioner also includes an 11-page narrative summary stating that one of the victims in Petitioner's case made a lengthy report to the Rockford police alleging that Scott Sheeley took nude photographs of them. (*Id*. at pp. 11-21.) The report goes on to detail an ongoing investigation over several days during which Officer Stetler of Rockford police purportedly spoke with Detective Timmerman, Mr. Workman, the victims, their mothers, one of their boyfriends, and Mr. Workman's employee Trina. (*Id*.) It further states that Officer Stetler was present to execute search warrants and that he went to Auglaize County jail to interview Petitioner. (*Id*. at 13-14.)

There are multiple problems with the narrative report. First, unlike other police reports in the record, it has no department header or footer and contains no information identifying the officer who purportedly wrote it. (*Compare id*. at 11-21 *with* ECF Doc. 1-5, p. 22.) The report also places a Rockford police officer at nearly every important event in the investigation of Mr. Workman's case. (ECF Doc. 1-6, pp. 11-21.) In contrast, the trial testimony indicates that one victim initially went to the Rockford police but was quickly transferred to the Mercer County Sheriff's Office, which had jurisdiction over the reported crime and took over the investigation. (*See* ECF Doc. 13-1, pp. 228-29 (Tr. 220:21-221:6), 389-90 (Tr. 381:1-382:10).)

Consistent with the testimony, the cover letter from the Rockford police chief informs Petitioner that the Rockford Police Department does not handle incidents that occur outside their jurisdiction, even if the person reporting the crime lives in the Village of Rockford. (ECF Doc.

1-6, p. 9.)  It states that when someone reports a crime that occurred outside of Rockford, they "assist that person in contacting the agency that would have jurisdiction. In this case that is what occurred and *would not require us to generate a report when we have nothing in it*."  (*Id.* (emphasis added).)  The letter directs Petitioner to an attached daily log showing what the officer on duty did on September 30, 2013.  (*Id.*)  The letter does not mention a longer report, and in fact denies that such a report exists.  In light of the Rockford Police Chief's cover letter and the questionable formatting and suspicious content of the long narrative report—which appears to give an outsized roll to Rockford police in the investigation—the undersigned finds that the purported 11-page narrative portion of the Rockford police report is unreliable and does not constitute new "reliable" evidence for the purpose of this equitable tolling analysis.

Turning to the Collingsworth, Chapman, and Leugers affidavits, the undersigned found the Collingsworth and Chapman affidavits unreliable in Sections III.C.3.i., III.C.3.ii.a., and III.C.3.ii.b. *supra*.  The Leugers affidavit is unreliable for similar reasons.  Mr. Leugers avers that he used to work out at Mr. Workman's gym, and that he prepared his 2020 affidavit after meeting with Mr. Workman in prison.  (ECF Doc. 1-5, p. 37.)  In the affidavit, he discusses information he purportedly knew in 2013 and 2015 that showed Mr. Workman "wasn't guilty of the crime he was put in prison for" but gives no explanation for waiting five to seven years to come forward with that information.  (*Id.* at pp. 37-38.)  As previously discussed, statements by fellow inmates and people closely aligned with a defendant are generally suspect, as are affidavits purporting to exonerate a defendant after a lengthy delay.  *See, e.g., House*, 547 U.S. at 552; *McQuiggin*, 569 U.S. at 399; *Herrera*, 506 U.S. at 423; *Hubbard*, 98 F.4th at 749-50; *Lewis*, 100 F. App'x at 355; *Jordan*, 2013 WL 766190, at *9.  The undersigned therefore

concludes that the Collingsworth, Chapman, and Leugers affidavits do not constitute new "reliable" evidence for the purpose of this equitable tolling analysis.

But even if the above evidence were "reliable," it is still inadequate to establish—in the context of the entire evidentiary record—that Mr. Workman is factually innocent.  The Chapman affidavit details the extensive relationship the victims allegedly had with Scott Sheeley.  (ECF Doc. 1-5, pp. 39-41.)   To the extent Petitioner would rely on this to show his actual innocence, it does not.  Rather, even if true, it would merely serve to impeach the victims' testimony at trial that they did not know Scott Sheeley well.  The Collingsworth and Leugers affidavits claim that the victims were in fact photographed by Scott Sheeley but entered a scheme to accuse Petitioner instead.  Specifically, the Collingsworth affidavits claim that Petitioner's ex-girlfriend Amanda paid the girls to do this (ECF Doc. 10-4, p. 570), while the Leugers affidavit states the girls accused Mr. Workman because he interfered with their stripping endeavors, and they thought they could get money from him (ECF Doc. 1-5, at pp. 37-38).  Thus, not only are the two stories different, but again, they merely impeach the victims' testimony about who photographed them. *See Calderon*, 523 U.S. at 563; *Mason*, 2024 WL 3825235, at *6.

Notably, even though Mr. Workman purportedly did not have any of the information from the affidavits at trial, much of his defense strategy rested on attempting to impeach the victims with evidence that they knew Scott Sheeley well and suggesting that they first reported Scott Sheeley to police and later changed their story to implicate Mr. Workman.  (*See, e.g.,* ECF Doc. 13-1, pp. 253-55 (Tr. 245:20-247:7), 270-73 (Tr. 261:23-265:21), 369-71 (Tr. 361:18-363:17), 402-03 (Tr. 394:1-395:19).)  While there was some confusion in the initial police report about the exact identity of the Scott in question, the Mercer County detective who first spoke with the victims explained at length how police came to identify Mr. Workman as the

perpetrator.  (*Id*. at pp. 230-31 (222:10-223:25), 390-99 (Tr. 382:11-386:4, 387:9-391:16).)

Furthermore, the following evidence supported Petitioner's conviction: both victims

affirmatively identified Petitioner at trial as the man who took their photographs (*id*. at pp. 218

(Tr. 210:9-25), 316-18 (Tr. 308:14-310:4), 383-84 (Tr. 374:18-375:25)); police extracted nude

photographs of the victims from two phones and SD cards found in Petitioner's work truck (*id*. at

pp. 550 (Tr. 542:13-18), 558-71 (Tr. 550:3-563:3), 596 (587:7-17), 614-17 (Tr. 606:23-609:7),

656-57 (Tr. 648:5-649:24)); and texts between one of the victims and Petitioner led to his arrest

at a hotel where they had planned to stage another photo shoot (*id*. at 338-347 (Tr. 330:6-336:6,

338:1-339:5)).  As the state court put it, "the evidence at trial against [Mr. Workman] was

overwhelming."  (ECF Doc. 10-1, p. 702.)

Accordingly, the undersigned concludes that the Collingsworth, Chapman, and Leugers

affidavits and the purported narrative attached to the Rockford police report are not new reliable

evidence sufficient to show "it is more likely than not that no reasonable juror would have

convicted" Mr. Workman under his theory that he is innocent because a different Scott took and

possessed the nude photographs of the victims.

### d.    "Man in the Mirror" Argument

Mr. Workman also argues that his innocence is demonstrated by the affidavits of forensic

expert Mark Lucas and documents from Viper Systems and PC Solutions that show he is not the

man pictured in State's Exhibit 104-3.  (ECF Doc. 1-1, pp. 31-37; ECF Doc. 11, pp. 7-10, 25.)

State's Exhibit 104-3 is a photograph of one of the victims (clothed) in front of a mirror and

shows the reflection of a man taking the picture in the mirror.  (ECF Doc. 13-1, pp. 322 (Tr.

314:4-18).)  The flash is obscuring part of the man's face, but the girl in the picture testified at

trial that the man in the picture, and the man who took all the nude photographs of her and the

32

other victim, was Mr. Workman. (*Id.*) Mr. Workman asserts that the Lucas affidavits and the two forensic reports prove the photograph in question was taken on November 5, 2013, after his arrest, and that he therefore cannot be the man in the mirror. (ECF Doc. 11, p. 25.) He further argues that the Lucas affidavits prove he is not the man in the photographs because Mr. Lucas opined that the man in the picture has a tattoo, and Petitioner has none. (*Id.* at pp. 8-10.)

Beginning with the question of reliability, the undersigned finds neither the PC Solutions nor the Viper Systems document constitutes reliable evidence for purposes of establishing when the photograph in State's Exhibit 104-3 was taken. The PC Solutions document contains only handwritten notes stating that "file was taken Tues, November 5, 2013." (ECF Doc. 1-5, p. 29.) Nothing about this document connects the file at issue to Petitioner's case or State's Exhibit 104-3. It is not signed, dated, or notarized, and contains no information about the qualifications of the individual reviewing the file. (*Id.*) The Viper Systems document is titled "Work Ticket" and has a Viper Systems logo and some technical information, with handwritten text near the top stating: "DATE TAKEN 11/5/2013." (*Id.* at p. 30.) Like the PC Solutions document, the work ticket does not contain information tying it to Petitioner's case or the photograph in State's Exhibit 104-3, and does not identify who made the handwritten note, what qualifications the person had, or what inquiry or testing the note was based on. (*Id.*)

In contrast, the Lucas affidavit is signed, dated, and notarized, and provides some details regarding Mr. Lucas's professional experience, the nature of his investigation, and his ultimate findings regarding the image in question. (ECF Doc. 1-5, pp. 31-32.) Specifically, he reports that he was provided a disc containing the image after reviewing a paper copy, and explains:

> Upon opening the image <u>I found the image to be absent of all the meta data that would show what type of camera, date, time, possible location and pertinent details about the image</u>. What I found was extremely out of the ordinary for being a image used in legal proceedings. <u>This image contained no meta data as to its origin. The</u>

33

> image actually showed a date taken date as being 11/5/2013 with no camera or
> device information. It further showed a creation date on 1/16/2014 making it appear
> it was created or edited in a editing program before being saved. These dates do not
> coincide with typical meta data in a image. Having only the data from this image it
> appears that the image was made or created using a photo editing program. If the
> image was not made the image had to have been manipulated using a photo editing
> software to remove the meta data like this.
>
> I used three separate meta data software programs to examine this image. In all my
> years of experience in evidential photography I have never seen a image such as
> this used for legal purposes. There is no way to validate the image is a true account
> of what is represented in the image. All of the evidence I am seeing is making it
> appear the image 1.jpg was made in a photo editing program and was not actually
> taken from a camera or device. If it was taken from a camera or device it has been
> modified.

(*Id.* (emphasis added).)  Thus, Mr. Lucas's opinion highlights the lack of reliable metadata to

establish when, where, and with what camera the photo was originally taken; and based on that

lack of information, he speculates that the photo may have been modified or created using photo

editing software.  (*Id.*)  Mr. Lucas does not, however, offer a professional opinion finding that

the original photograph was taken on November 5, 2013, as Petitioner now argues.

To the extent that Mr. Workman offers the Lucas affidavit to establish that the

photograph in Exhibit 104-3 was taken in November 2013, the undersigned finds that the

affidavit is not new "reliable" evidence to establish that fact.  On the contrary, Mr. Lucas's

affidavit specifically emphasizes the lack of reliable evidence to show when, where, or with what

camera the photograph was taken.  The Ohio Third District Court of Appeals addressed this same

issue when Mr. Workman submitted Mr. Luca's affidavits to the state court, explaining:

> On appeal, Workman claims that he has new evidence that shows the photograph,
> admitted as State's Exhibit 104-3, was taken on November 5, 2013, which was after
> he had been taken into custody. However, this alleged expert could not have
> pinpointed the exact date that this photo was taken for two key reasons. First, the
> metadata had been removed prior to Workman's apprehension, making it
> impossible to determine exactly when this photograph was taken. Second, the
> screenshot submitted with Workman's petition shows that this alleged expert was
> examining the file properties of the photograph that was admitted as State's Exhibit
> l04-3. Doc. 548. The date that is shown on the file properties in this screenshot is

34

> not the date on which this photograph was taken. Trial Tr. 661. Rather, these file
> properties only show when the digital file that was given to Workman during
> discovery was created. Doc. 548.

(ECF Doc. 10-1, pp. 821-22 (footnotes omitted).) The court went on to note that expert

testimony was presented at trial, on direct and cross examination, regarding the absence of

metadata to establish when the photograph was taken. (*Id.* at pp. 822-23.)

The state court's factual findings—specifically that the date on the digital file reflects

when the copy given to Mr. Workman in discovery was created, not when the original picture

was taken—is presumed correct unless Mr. Workman rebuts the presumption by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1); *Railey*, 540 F.3d at 397. The undersigned finds

Mr. Workman has failed to rebut this presumption, and that none of the evidence submitted with

his Petition constitutes "reliable" evidence establishing that the photograph in Exhibit 104-3 was

originally taken in November 2013, after Mr. Workman was in custody.

Turning to whether the man in the photograph has a tattoo or not, Mr. Lucas averred that

he was "one hundred percent sure the male subject has tattooing on his bicep area," that he

examined photographs of Mr. Workman, and that "Mr. Workman has no tattoos on either bicep."

(ECF Doc. 1-5, pp. 24-25.) Mr. Workman asserts this proves he is not the man in State's Exhibit

104-3, and therefore cannot be the man who photographed the victims. (ECF Doc. 11, pp. 7-9.)

However, as the Third District pointed out when reviewing the Lucas affidavits, Mr. Workman

had his own expert examine State's Exhibit 104-3 at the time of his trial. (ECF Doc. 10-1, p.

819; ECF Doc. 13-1, pp. 906-09.) Petitioner's expert testified at trial that he could not determine

whether the man in the photograph had a tattoo on his arm, and that the dark area may just be a

shadow. (ECF Doc. 13-1, pp. 908 (Tr. 900:3-901:4), 910-11 (Tr. 902:19-903:5).)[8]

---

[8] Petitioner also testified at trial that he could not be the man in the photograph because his own "little tattoo" was
not visible on the man pictured in State's Exhibit 104-3. (ECF Doc. 13-1, pp. 961-65 (Tr. 953:19-956:13).)

Thus, at most Mr. Lucas's affidavit provides a new, slightly different opinion based on the same evidence that was examined and discussed by Mr. Workman's prior expert at trial. Such evidence is cumulative of the evidence already presented at trial, and insufficient to support a finding of actual innocence. *See, e.g., Howard v. Wolfe*, 199 F. App'x 529, 534 (6th Cir. 2006); *cf. Souter v. Jones*, 395 F.3d 577, 593 (6th Cir. 2005) (finding new expert affidavits were "new reliable evidence" for purposes of actual innocence analysis when former prosecution experts withdrew the opinions they previously offered at trial, explaining "the new affidavits do not merely add to the defense, but also deduct from the prosecution"). In the context of all the evidence presented at trial, including the direct testimony of both victims at trial that Mr. Workman was the man who took their photographs (ECF Doc. 13-1, pp. 218 (Tr. 210:9-25), 316-18 (Tr. 308:14-310:4), 383-84 (Tr. 374:18-375:25)), the addition of one more expert speculating as to whether a picture that was presented to the jurors shows a shadow or a tattoo is insufficient to demonstrate "it is more likely than not that no reasonable juror would have convicted" Mr. Workman because he is not the man pictured in State's Exhibit 104-3.

The Sixth Circuit has explained that a petitioner seeking equitable tolling under the fundamental miscarriage of justice standard must do "more than only undermine the state's case." *Hubbard*, 98 F.4th at 748. Equitable tolling is available only in "a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at 395 (brackets in original) (quoting *Schlup*, 513 U.S. at 329). Considering the whole record, the undersigned finds that none of the evidence submitted by Petitioner constitutes "new reliable evidence" sufficient to support a finding that it is "more likely than not that no reasonable juror" would have convicted

36

him.  Thus, he has not shown that a fundamental miscarriage of justice will occur if his untimely

Petition is not heard and has not met his burden to support equitable tolling under this standard.

For the reasons set forth above, the undersigned finds no grounds to apply equitable

tolling to extend the statute of limitations beyond September 9, 2017.  Thus, Mr. Workman's

Petition, filed in July 2024, is untimely under § 2244(d)(1)(A) by almost seven years.

### 4.      Mr. Workman Has Made a Colorable Showing That He May Be Entitled to a Later Start Date for the Statute of Limitations Under § 2244(d)(1)(D)

The final question presented by Respondent's motion is whether any of the claims in the

Petition were timely filed under 28 U.S.C. § 2244(d)(1)(D), which provides that "[t]he limitation

period shall run from . . . the date on which the factual predicate of the claim or claims presented

could have been discovered through the exercise of due diligence."  Respondent argues that the

"supposedly exonerating evidence" in the 2023 Collingsworth affidavits cannot support a later

start date for the statute of limitations under § 2244(d)(1)(D) because Mr. Workman "could have

discovered this evidence with due diligence years prior due to his contact with [Mr.]

Collingsworth."  (ECF Doc. 10, p. 35.)  While Mr. Workman does not explicitly argue that he is

entitled to a later start date under § 2244(d)(1), he argues that he exercised "due diligence" in

"uncovering multiple pieces of newly discovered evidence . . . until and through 2023."[9]  (ECF

Doc. 1, p. 14.)

The 2023 Collingsworth affidavits are the only "new" evidence submitted with the

Petition that could possibly support a finding that the Petition was timely filed on July 11, 2024.

In those affidavits, Mr. Collingsworth swore that he transferred pictures onto a black iPhone at

the request of Officer Chisholm in 2013, and that he witnessed the victims in Mr. Workman's

---

[9] Considering Petitioner's pro se status, the undersigned considers this argument sufficient to trigger consideration of a later start date under § 2244(d)(1)(D).

37

case agreeing to testify falsely against him at trial. (*See* ECF Doc. 10-4, pp. 569, 570, 573, 577.) Respondent argues that Mr. Workman cannot show he was unable to discover this evidence with due diligence, "if it is to be believed." (ECF Doc. 10, p. 35.) But Mr. Workman asserts that he did not know about "the secret illegal activities of someone manufacturing evidence to use against him at trial" until he received the Collingsworth affidavits in 2023. (ECF Doc. 11, pp. 21, 31.) And Mr. Collingsworth purports to answer the question whether he told Mr. Workman when they met in prison about Officer Chisholm giving him the three phones to keep Mr. Workman in jail, answering: "Hell no." (ECF Doc. 1-5, p. 17.)

In assessing whether the "factual predicate" to a claim "could have been discovered through the exercise of due diligence" under § 2244(d)(1)(D), this Court must consider: (1) whether any information newly disclosed in the Collingsworth affidavits constitutes a "factual predicate" for any of Mr. Workman's claims; and (2) when Mr. Workman could have discovered any such factual predicate "through the exercise of due diligence." Neither Respondent's motion nor Petitioner's response to the motion addresses these questions with specificity.

### i. The Collingsworth Affidavits Cannot Supply a Factual Predicate for Grounds Two, Five, Six, Seven, or Eight of the Petition

As to the first question—whether the Collingsworth affidavits provide the "factual predicate" for Mr. Workman's habeas claims—this Court must consider each of Mr. Workman's claims separately. *See Ege v. Yukins*, 485 F.3d 364, 373 (6th Cir. 2007) (noting that habeas claims must be analyzed separately in assessing the "factual predicate" for the claims); *see also Pace*, 544 U.S. at 416, n.6 (noting that §§ 2244(d)(1)(B), (d)(1)(C), and (d)(1)(D) "require claim-by-claim consideration"). Neither party briefed this issue.

Although Congress did not define "factual predicate" as used in § 2244(d)(1)(D), "courts generally agree that 'a factual predicate consists only of the "vital facts" underlying the claim.'"

*Ayers v. Ohio Dep't of Rehab. and Corr.*, 113 F.4th 665, 670 (6th Cir. 2024) (quoting *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012)).  A fact is considered "vital" if that same fact "is required for the habeas petition to overcome sua sponte dismissal."  *Id.*  Conversely, evidence "does not form a 'vital fact' where it is 'merely cumulative to the evidence already presented by the defense at trial.'"  *Magee v. Braman*, No. 2:23 CV 12406, 2025 WL 698698, at *5 (E.D. Mich. Mar. 4, 2025) (quoting *Souter*, 395 F.3d at 587 (6th Cir. 2005)) (emphasis removed).

Based on an independent review of the Petition, the undersigned concludes that the information in the Collingsworth affidavits cannot serve as the "factual predicate" for Petitioner's second, fifth, sixth, seventh, and eighth grounds for relief.  In Ground Two, Mr. Workman claims his trial counsel was ineffective for failing to investigate, failing to file a motion to suppress the phone evidence, and failing to make certain arguments or objections at trial.  (ECF Doc. 1-2, pp. 8-42.)  He bases this claim on the Lucas affidavits, the PC and Viper Systems reports, the Timmerman report, Sgt. Pack's incident report, the Leugers affidavit, his own assertions about what happened, and other information not discussed herein.  (*Id.*)  In Ground Five, Mr. Workman alleges the prosecutor intentionally mislead the jury by misstating facts in his opening and closing statements and allowed witnesses to lie during their testimony.  (ECF Doc. 1-3, pp. 16-48.)  He does not rely on the Collingsworth affidavits to support his claims of lies and misstatements.  (*Id.*)  In Ground Six, Mr. Workman argues that his due process rights under the 14th Amendment to the U.S. Constitution were violated when the state and trial court permitted an expert witness to testify "beyond the experts [sic] purported expertise."  (*Id.* at pp. 48-50; ECF Doc. 1-4, pp. 1-2.)  In Ground Seven, Mr. Workman claims that the search and seizure of his company's work truck was illegal.  (ECF Doc. 1-4, pp. 2-9.)  In Ground Eight, he

claims the state court of appeals unlawfully changed the record, making its factual findings false, relying solely on the trial transcript and evidence presented at trial. (*Id.* at pp. 9-17.)

Since none of the aforementioned grounds for relief rely on factual predicates newly revealed in the Collingsworth affidavits, the undersigned finds these five grounds are not eligible for a later start date under § 2244(d)(1)(D). Since the undersigned has also concluded that the claims in the Petition are barred by the statute of limitations under § 2244(d)(1)(A), and are not preserved through statutory or equitable tolling, as explained in Sections III.C.1-3, *supra*, the undersigned recommends that the Court **GRANT** Respondent's Motion to Dismiss with respect to Grounds Two, Five, Six, Seven, and Eight and **DISMISS** those grounds with prejudice.

### ii. The Collingsworth Affidavits May Provide a Factual Predicate for Grounds One, Three, Four, Nine, Ten, and Eleven

In Grounds One, Three, Four, Nine, Ten, and Eleven, Petitioner makes arguments that rely, at least in part, on the allegations in the Collingsworth affidavits, specifically: that he is actually innocent (ECF Doc. 1-1, pp. 18-50; ECF Doc. 1-2, pp. 1-8); that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it did not disclose that a police officer manufactured evidence (ECF Doc. 1-2, pp. 42-50; ECF Doc. 1-3, pp. 1-10); that Officer Chisholm and Mr. Workman's ex-girlfriend Amanda tampered with witnesses and manufactured evidence (ECF Doc. 1-3, pp. 10-15); that the trial court did not have subject matter jurisdiction because police planted/manufactured evidence (ECF Doc. 1-4, pp. 17-21); that the trial court abused its discretion when it denied his motions for a new trial and did not hold a hearing on new evidence, including the Collingsworth affidavits (ECF Doc. 1-4, pp. 21-30); and that the state "broke the chain of custody" for the phones used as evidence at trial (*id.* at pp. 30-31).

Mr. Collingsworth purports to confess his own involvement in tampering with evidence that was later presented at trial, reportedly under instructions from a police officer involved in

the investigation, and further asserts that he personally observed two witnesses agreeing to give perjured testimony at trial.  (ECF Doc. 1-5, pp. 12, 15-16; ECF Doc. 10-4, pp. 569-73.)  These facts, if established, could be considered "vital" to the above claims, and it is not clear from the record and argument presently before the Court that they are "merely cumulative to the evidence already presented by the defense at trial."  *Souter*, 395 F.3d at 587; *see Ayers*, 113 F.4th at 670.

In assessing this issue, the undersigned notes again that neither party offered specific argument as to which, if any, grounds for relief are based on a "factual predicate" that was newly identified in the Collingsworth affidavits.  Given that neither party has presented a developed argument as to what facts are "vital" to each of the individual claims and/or whether the facts presented in the Collingsworth affidavits are "merely cumulative," and considering Petitioner's pro se status, the undersigned presumes for purposes of the present motion that the Collingsworth affidavits do establish a factual predicate for Grounds One, Three, Four, Nine, Ten, and Eleven.  The undersigned accordingly turns to the question of due diligence.

### iii.    Petitioner Has Made a Colorable Showing that the Factual Predicates Underlying Certain Claims Could Not Have Been Discovered Earlier Through the Exercise of Due Diligence

Under § 2244(d)(1)(D), the limitation period runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  To determine whether Mr. Workman has satisfied this requirement, this Court must "consider 'when a duly diligent person in [his] circumstances would have discovered' the factual predicate for [his] claim[s]."  *Ayers*, 113 F.4th at 672 (quoting *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006)).  In making this determination, Mr. Workman's own "subjective diligence is irrelevant."  *Id.* at 673.  "[T]he proper analysis is whether due diligence 'could have' revealed the factual predicate if it was employed."  *Id.* at 673-74.  Nevertheless, Petitioner has

41

the burden of showing that he exercised due diligence in discovering the factual predicate of his habeas claims.  *See Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002).

Respondent argues that Mr. Workman has not satisfied this requirement because Mr. Collingsworth was his "employee and friend," and Mr. Workman therefore "could have discovered this evidence with due diligence years prior due to his contact with Collingsworth." (ECF Doc. 10, p. 35.)  In other words, Respondent appears to argue that more diligent actions in communicating with Mr. Collingsworth would have uncovered the factual revelations in the Collingsworth affidavits at an earlier date.  But Mr. Collingsworth avers that he kept quiet about the relevant facts until recently because of his purported agreement with police officers and would have remained quiet even until today if the officers had kept to that agreement.  (ECF Doc. 1-5, pp. 8-10.)  And he asserts that he did not reveal the relevant information to Mr. Workman when the two met and discussed Mr. Workman's case when they were in prison together.  (*Id*. at p. 17.)

The undersigned is mindful that it is Mr. Workman's burden to show that he exercised diligence in seeking the factual predicates for his claims.  *Stokes*, 36 F. App'x at 804.  Here, Petitioner asserts that did not know about "the secret illegal activities of someone manufacturing evidence to use against him at trial" until he received the Collingsworth affidavits in 2023 (ECF Doc. 11, pp. 21, 31), but has not offered more specific details regarding when he learned of the factual revelations in the affidavits, and has not explained what role he or others played in uncovering those facts and/or obtaining the affidavits.  Nevertheless, the undersigned is "reluctant to find that 'due' or 'reasonable' diligence would require an individual to actively seek out [evidence] he did not know existed."  *Magee*, 2025 WL 698698, *6; *see also Ayers*, 113

F.4th at 674 ("Even if Ayers's subjective diligence were relevant, she could not have diligently pursued a claim she did not know she had.").

Based on the evidence presently before this Court, and absent more specific briefing from the parties on the relevant evidence and related legal standards, the undersigned finds that Mr. Workman has raised at least a colorable question as to whether a duly diligent person in his circumstances would have discovered the factual predicates set forth in the Collingsworth affidavits earlier than September 2023, when the first Collingsworth affidavit was forwarded to him by the Mercer County Public Defender. (ECF Doc. 1-5, pp. 2-18.)

In reaching this conclusion, the undersigned does not disregard the findings discussed in Section III.C.3., *supra*, that the Collingsworth affidavits lack reliability for purposes of an equitable tolling analysis given Mr. Collingsworth's relationship with Mr. Workman as a former employee and fellow-inmate, the significant delay between the acts described in the affidavits and their disclosure, and the suspicious circumstances of those disclosures, i.e., the fact that Mr. Collingsworth filed a lengthy affidavit full of details relevant only to Mr. Workman's conviction in his own criminal proceedings, while simultaneously failing to include details relevant to his own criminal proceedings. Certainly, the undersigned continues to have significant concerns regarding the reliability of the Collingsworth affidavits.

Nevertheless, the early stage of the present proceedings and limited briefing regarding the relevant law and the evidentiary record[10] distinguish this case from other cases, like the Eastern District of Michigan's decision in *Owens v. Campbell*, No. 15-CV-12677, 2020 WL 833156 (E.D. Mich. Feb. 20, 2020), where the court concluded that a petitioner did not meet his burden

---

[10] For example, Respondent filed the present motion without attaching or discussing the trial transcripts due to the perceived "lack of relevancy to the pending motion." (ECF Doc. 10, p. 4, n.1.) The undersigned ordered the filing of the trial transcripts pursuant to Petitioner's request (ECF Doc. 12), which Respondent filed after briefing on the motion was complete (ECF Doc. 13).

under § 2244(d)(1)(D) because his "theory of diligence and timeliness [wa]s not supported by trustworthy evidence" after the court completed preliminary proceedings, obtained supplemental briefing, and conducted a limited evidentiary hearing.  *See Owens*, 2020 WL 833156, at *10.

Because the statute of limitations does not present a jurisdictional bar to habeas review, this Court is not required to address the statute of limitations before considering the merits of the Petition.  *See Moss v. Miniard*, 62 F.4th 1002, 1010 (6th Cir. 2023), cert. denied, 144 S. Ct. 1004 (2024) ("[B]ecause the statute of limitations does not present a jurisdictional bar to habeas review, and because we hold that Moss is not entitled to habeas relief for the reasons discussed below, we decline to determine on appeal whether the district court properly tolled Moss's petition.").  This Court may therefore consider the merits of the Petition before addressing the statute of limitations if resolution on the merits is more straightforward.

In the dual interests of thoroughness and judicial efficiency, considering the early stage of the present proceedings and the lack of detailed briefing from Respondent regarding the law and the evidentiary record, and given Mr. Workman's presentation of at least a colorable basis to conclude that the factual predicates for the claims in Grounds One, Three, Four, Nine, Ten, and Eleven could not have been discovered through reasonable diligence earlier than 2023, the undersigned recommends that the Court **DENY without prejudice** Respondent's Motion to Dismiss Grounds One, Three, Four, Nine, Ten, and Eleven on statute of limitations grounds.

In the event that the Court adopts this recommendation, the undersigned **ORDERS** that: Respondent shall file an Answer/Return of Writ to address the remaining grounds for relief— Grounds One, Three, Four, Nine, Ten, and Eleven—within 60 days of the entry of the Court order adopting this recommendation; Petitioner shall file a Reply/Traverse within 45 days of the filing of the Answer/Return of Writ; Respondent may file a Sur-reply within 15 days of the filing

44

of the Reply/Traverse only to address any new issues raised in the Reply/Traverse.  Upon full briefing, the Court will be in a position to determine whether the remaining claims are more appropriately resolved on statute of limitations grounds or based on the merits of the Petition.

### IV.    Recommendation

For the reasons set forth above, the undersigned recommends that the Court: **DENY** Petitioner's Motion for Bond; **GRANT** Respondent's Motion to Dismiss Grounds Two, Five, Six, Seven, and Eight of the Petition as untimely under the statute of limitations and **DISMISS** Grounds Two, Five, Six, Seven, and Eight with prejudice; and **DENY without prejudice** Respondent's Motion to Dismiss Grounds One, Three, Four, Nine, Ten, and Eleven.

In the event that the Court adopts this recommendation, the undersigned **ORDERS** that: Respondent shall file an Answer/Return of Writ to address the remaining grounds for relief— Grounds One, Three, Four, Nine, Ten, and Eleven—within 60 days of the entry of the Court order adopting this recommendation; Petitioner shall file a Reply/Traverse within 45 days of the filing of the Answer/Return of Writ; Respondent may file a Sur-reply within 15 days of the filing of the Reply/Traverse only to address any new issues raised in the Reply/Traverse.

July 29, 2025

_/s/ Amanda M. Knapp_____
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).